# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN SIEHL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 18-77J |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF JOHNSTOWN, CAMBRIA | ) | Magistrate Judge Lenihan |
| COUNTY, DAVID TULOWITZKI, | ) | |
| DANIEL LOVETTE, MERRILL BRANT, | ) | |
| SCOTT ERMLICK, ANGELO | ) | |
| CANCELLIERE, and LAWRENCE | ) | |
| WAGNER, | ) | Re: ECF Nos. 24 & 28 |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Presently before the Court in this civil rights action filed pursuant to 42 U.S.C. § 1983 are motions to dismiss. The underlying facts and circumstances concern the alleged misconduct of law enforcement officers from multiple agencies—Defendant City of Johnstown Police Department ("Defendant Johnstown") and its police officers Angelo Cancelliere ("Cancelliere") and Lawrence Wagner ("Wagner"); Pennsylvania State Police Trooper Merrill Brant ("Brant") and Pennsylvania State Police forensic scientist supervisor Scott Ermlick ("Ermlick")[1]; Cambria County's District Attorney's Office ("Defendant Cambria County") and its Assistant District Attorneys David Tulowitzki ("Tulowitzki") and Daniel Lovette ("Lovette"). These named Defendants allegedly caused the wrongful conviction and incarceration of Plaintiff Kevin Siehl ("Plaintiff" or "Siehl") for the murder of his wife in 1991 for which he spent 25 years in prison. On July 14, 2016, Plaintiff's conviction was vacated and the criminal charges against him were dismissed. For the reasons discussed below, the Motion to Dismiss filed by Defendants Cambria County, Tulowitzki, and Lovette (ECF No. 24) will be denied. The Motion to Dismiss filed by

---

[1] Defendants Brant and Ermlick are sued in their individual capacities only. (Complaint, ECF No. 1 ¶¶ 12 & 13.)

Defendants Brant and Ermlick (ECF No. 28) will be denied. All Motions to Dismiss on the grounds of absolute or qualified immunity will be denied without prejudice to raising the issue again after the close of discovery on summary judgment. The Court also acknowledges Plaintiff's voluntary dismissal of the supplemental state law claim at Count VIII against Defendants Brant and Ermlick.

## I.    RELEVANT FACTUAL ALLEGATIONS

In his responsive briefs to the Motions to Dismiss (ECF Nos. 30 & 36), Plaintiff summarizes the allegations of the Complaint (ECF No. 1) as follows:

### A.    The Murder, Forensic Evidence, and alleged Fabricated Connection to Plaintiff

Christine Siehl was found dead in her bathtub on July 14, 1991. Complaint at ¶¶ 18-19. Two Johnstown police officers, Defendant Sergeant Angelo Cancelliere and Defendant Investigator Lawrence Wagner, were assigned to investigate the case. On arrival at Christine Siehl's apartment, they found signs of a violent struggle. *Id.* ¶¶ 20-22. In the bathroom, they located glass from a broken mirror and kitty litter strewn about the floor and in the bathtub. *Id.* ¶ 22. There was a large amount of blood on the floor, smeared on the wall, and spattered in other areas, including the bathroom doorframe. *Id*. Based on her position, investigators believed Christine Siehl had been placed in the bathtub after she was killed and that the showerhead had been adjusted to spray water onto her body. *Id.* ¶ 23.

Defendants Cancelliere and Wagner expected they would be able to locate important forensic evidence in the bathroom so they requested assistance from the Pennsylvania State Police. *Id.* ¶ 24. The next day, Defendant Brant, a Pennsylvania State Police trooper, went to the apartment to process the scene. *Id.* ¶ 25. He recovered a single latent fingerprint on the

showerhead, a number of blood samples from the bathroom, and other items that appeared to have blood on them, including a towel. *Id.* ¶¶ 26-27.

Defendants Cancelliere and Wagner decided to focus their investigation on Siehl. *Id.* ¶¶ 28-30. They made this decision despite the fact they were aware of at least two other people who had motives to harm Christine Siehl: Frank Willis, a man who had been in a relationship with Christine Siehl while she was married to Plaintiff; and Robert "Bobby" Prebahalla, Plaintiff's nephew, who was known to have stated that he would kill Christine Siehl if she ever did anything to hurt Plaintiff. *Id.* ¶ 31. Cancelliere and Wagner considered Siehl their prime suspect and informed every other law enforcement officer working on the investigation of their belief that Siehl was the murderer. *Id.* ¶¶ 30-32. Based on this belief, the Defendants jointly agreed to seek out evidence they could use to buttress the case against Siehl. *Id.* ¶ 33.

In the weeks that followed the murder, Defendants Brant and Ermlick produced reports asserting that forensic evidence pointed to Siehl's guilt. They relied on three pieces of evidence. First, Defendant Brant issued a report stating that the latent print found on the showerhead belonged to Siehl, and later, Brant informed the other Defendants that because the fingerprint had not deteriorated it must have been left within the 24 to 36 hours before it was found. *Id.* ¶¶ 35-36. This assertion concerning the timing as to when the fingerprint was left was critical to the investigating officers as they believed Christine Siehl was killed at approximately 1:30 a.m. on July 13, a time closely approximating Defendant Brant's conclusion. *Id.* ¶¶ 68-70. Defendant Brant's assertions regarding the print, however, were false. *Id.* ¶ 37. Expert analysis conducted during Siehl's post-conviction proceedings confirmed that there is no scientific support for the proposition that a non-deteriorated latent print must be of recent origin, and in any event, the print found on the showerhead was not a match to Siehl. *Id.* ¶¶ 37, 39.

Second, Defendant Ermlick, a forensic scientist supervisor in the Pennsylvania State Police Greensburg Regional Laboratory, issued a report stating that one of the blood samples found on the bathroom door frame matched Siehl's blood. *Id.* ¶¶ 42-46. This assertion supported the investigating officers' theory that the killer had been wounded while repeatedly stabbing Christine Siehl and had left blood at the scene. *Id.* ¶ 47. Ermlick's assertion, however, was false. Similar to the latent print left on the showerhead, expert analysis during Siehl's post-conviction proceedings showed that, given the orientation of the blood spatter, found in a nearly perfect parallel left-to-right configuration on the doorframe next to a blood stain attributed to Christine Siehl, the stain could not have come from Siehl. *Id.* ¶ 48.

The third piece of forensic evidence was Siehl's L.A. Gear tennis shoes, which investigating officers claimed were stained with blood. *Id.* ¶¶ 50-51. After the shoes were obtained pursuant to a search warrant, *Id.* ¶¶ 52-53, Ermlick conducted testing on them and issued a report stating that the "shoes" were "presumptively positive" for blood, an assertion supporting the investigating officers' theory that Siehl had stained his shoes while in the blood-soaked bathroom. *Id.* ¶¶ 56-57. The assertion in the report was false, as evidenced by Ermlick's contemporaneous lab notes (never produced to Siehl until more than twenty years later in post-conviction litigation). *Id.* ¶¶ 58-59. The notes confirmed that there was no evidence of any blood on *both* shoes, as the right shoe was "unremarkable." *Id.* 58. Further, though the notes reference a "very light smear in the heal area" of the left shoe, the notes show that Defendant Ermlick could not confirm that the "smear" was human blood. *Id.*

Each of Brant's and Ermlick's false and misleading assertions in these reports was provided in an effort to support the investigating officers' position that Siehl had murdered Christine Siehl. *Id.* ¶¶ 38-39, 41, 49, 60. Based on this information, as well as fabricated reports

of witness interviews prepared by Defendants Cancelliere and Wagner, *Id.* ¶¶ 68-81, on August 30, 1991, an arrest warrant was issued for Siehl, and he was charged with the murder. *Id.* ¶¶ 87-91. On October 1, 1991, Defendants Tulowitzki and Lovette informed Siehl's defense counsel they would seek the death penalty. *Id.* ¶ 92.

## B. Violation of the Trial Court's Orders

Defendants Tulowitzki and Lovette, prosecutors employed by the Cambria County District Attorney's Office, were involved with the investigation from the earliest stages, and they too sought out evidence to support their claim that Siehl was the murderer. *Id.* ¶¶ 36, 49, 60.

### 1. Alleged Interference with the Defense Camp

Once Siehl was charged with capital murder, his attorneys recognized that the prosecution would be based on forensic evidence and sought permission from the trial court to retain a forensic scientist to consult with them about the case. *Id.* ¶ 93. The court authorized retention of an expert as part of the defense team. *Id.* ¶ 94. Defense counsel asked the prosecution to turn over evidence so that the expert could conduct an independent investigation, and the court granted that request. *Id.* ¶¶ 95-96. The court directed that the prosecution could have a representative present during the defense expert's investigation for the limited purpose of preserving the chain of custody, but the court specifically ordered that the prosecution's representative must not be "looking over the [expert's] shoulder" in any manner that would interfere with the expert's independent investigation for the defense. *Id.* ¶ 96. Despite the order, Tulowitzki and Lovette viewed the examination as an opportunity to learn about Siehl's planned trial defense, and they directed Defendant Brant to observe the examination. *Id.* ¶¶ 97-98.

Tulowitzki and Lovette conspired with Brant to seek out privileged and confidential information from the examination. *Id.* ¶ 98.[2]

The defense expert conducted a three-day examination of the forensic evidence in March 1992. *Id.* ¶ 100. Throughout that examination, Brant violated the trial court's order—as he was instructed to do by Tulowitzki and Lovette—and closely observed the defense expert's investigation. *Id.* Brant paid especially close attention to the expert's examination of Siehl's tennis shoes. *Id.* Following the expert's evaluation, Brant prepared typewritten notes for Tulowitzki and Lovette stating that he was certain the defense expert would "answer honestly that he found some incriminating evidence on the tennis shoe." *Id.* ¶ 104. He only acquired this information due to his interference with the expert's privileged and confidential evaluation of the evidence, all in violation of the trial court's order. *Id.*

The defense expert had, in fact, informed Siehl's defense counsel that the shoes showed evidence supporting the prosecution's belief that Siehl committed the murder. *Id.* ¶ 101. The expert's conclusions in this regard were erroneous and were later proven groundless in post-conviction litigation. *Id.* ¶ 102. At the time of trial, Tulowitzki and Lovette used the defense expert's faulty conclusions to promote the prosecution's strategic advantage. Despite the defense team's indication that they would only present their expert to address limited topics, Tulowitzki and Lovette informed the trial court (without acknowledging their violation of the court's order precluding interference with the defense expert's evaluation) that they intended to conduct a thorough cross examination of the expert on all of his findings. *Id.* ¶¶ 105-06. As a result, Siehl's defense counsel decided not to present the expert for any purpose. *Id.* ¶ 107. Thus, the actions of Tulowitzki, Lovette and Brant in violating the trial court's order and improperly

---

[2] Alternatively, at a minimum, Tulowitzki and Lovette violated the trial court's order by failing to instruct Brant not to observe the expert's investigation. Complaint at ¶ 99.

invading the defense team's confidential work resulted in Siehl's inability to defend himself with any expert testimony on the forensic evidence in the case. *Id.* ¶ 108.

### 2. Failure to Disclose Mid-Trial Testing and Its Exculpatory Results

On May 11, 1992, the first day of testimony in Siehl's trial, Defendants Tulowitzki and Lovette directed Defendant Ermlick to conduct additional testing on the L.A. Gear tennis shoes taken from Siehl. *Id.* ¶ 111. Ermlick did so the same day and prepared detailed lab notes of his evaluation. *Id.* ¶ 111. In those notes, he made no mention of any blood on the left tennis shoe; instead, the notes stated only that there was a presumptive bloodstain on the right shoe, which appeared to be "from the inside out." *Id.* ¶ 112. These findings were highly significant for at least two reasons. First, a bloodstain "from the inside out" corroborated statements Siehl had made to investigating officers at the outset of the case, that he had injured his right ankle in the week before Christine Siehl's murder and that the wound bled in his shoe. *Id.* ¶ 113(a). Second, the finding that there was presumptive blood on the right shoe, but not on the left shoe, was directly inconsistent with Ermlick's lab notes from his initial testing that the left shoe had a "very light smear" and that the right shoe was "unremarkable." *Id.* ¶ 113(b). Such inconsistencies provided good reason to question Ermlick's qualifications as a forensic examiner and the credibility of his findings as to all forensic evidence in the case. *Id.* Tulowitzki and Lovette learned of Ermlick's findings immediately after Ermlick completed his evaluation. *Id.* ¶ 114. They knew Ermlick's findings corroborated Siehl's exculpatory statement to police, undermined the prosecution's theory of the case, and raised serious questions about the quality and credibility of the entire investigation preceding Siehl's arrest—facts that were all highly exculpatory for the defense. *Id.* ¶ 115. Despite this knowledge, Tulowitzki and Lovette ordered Ermlick not to prepare a formal

report of his findings, a direction Ermlick memorialized in his file. *Id.* ¶¶ 116-17. None of the information from the testing was provided to the defense. *Id.* ¶ 118.

Tulowitzki and Lovette gave Ermlick these instructions knowing they were violating the trial court's order earlier in the case directing them to provide the defense with all reports and results from forensic testing performed on evidence related to the prosecution. *Id.* ¶¶ 109, 118. They continued to willfully violate the trial court's order as the trial progressed. When Ermlick was called to the stand, he testified consistently with his earlier formal report (which had been disclosed to the defense) that there was a stain on the shoes presumptively positive for blood. *Id.* ¶ 120. During the testimony, the trial judge asked Tulowitzki and Lovette whether any additional testing had been conducted on the shoes. *Id.* ¶ 122. Knowing that the trial judge had earlier ordered them to disclose the results of all forensic testing and that the trial judge would order them to turn over the results of Ermlick's mid-trial testing, Tulowitzki lied to the trial judge and stated that no additional testing had been conducted. Lovette failed to correct Tulowitzki's false statement to the court. *Id.* ¶ 123. Due to Tulowitzki's and Lovette's violation of the trial court's order, Siehl's defense counsel was prevented from obtaining the significant exculpatory information which undermined the prosecution's theory of the case and supported Siehl's defense. *Id.* ¶¶ 119, 121.

C.    **Ermlick's Consumption of the Biological Evidence**

The evidence recovered in Christine Siehl's apartment included an abundance of biological material which the investigating officers believed contained the murderer's blood and which could have been submitted for DNA testing. *Id.* ¶ 63. On August 1, 1991, Ermlick, before he issued his final report, told Defendant Wagner that he believed Siehl's blood was in a

sample taken from the bathroom doorframe and on a towel. *Id.* He suggested to Wagner that some of the samples should be sent to a DNA laboratory, at a cost of about $2,250.00. *Id.*

Despite the obvious benefit of DNA testing—to the prosecution and to Siehl—and the availability of DNA analysis, the investigating officers failed to ensure that DNA testing was done. *Id.* ¶ 64. While law enforcement officials were debating whether and how to pay for testing, Ermlick consumed all of the blood samples in the non-DNA testing he was conducting for the prosecution. *Id.* ¶¶ 65-66. Accordingly, there was no material left for testing. *Id.* ¶ 66.

**D. The County's Failure to Issue Protocols for DNA Testing**

When Christine Siehl was murdered in 1991, law enforcement agencies throughout the United States were aware that DNA testing of biological material found in criminal investigations could provide conclusive evidence of guilt or innocence in a criminal case. *Id.* ¶ 61. Despite this knowledge, Defendant Cambria County, which had policymaking authority regarding investigative techniques in criminal cases arising in the County, failed to establish any policies, practice, or protocols concerning DNA testing of biological evidence. *Id.* ¶¶ 9, 62. In particular, the County failed to put into place any guidelines concerning payment for DNA testing in the event it was deemed necessary or helpful in a criminal investigation. *Id.* The County failed to do so knowing that persons suspected of criminal offenses could be conclusively exonerated (or inculpated) through DNA testing. *Id.*

Evidence recovered in Christine Siehl's apartment included an abundance of biological material which investigating officers believed contained the murderer's blood and which could have been submitted for DNA testing. *Id.* ¶ 63. On August 1, 1991, Defendant Ermlick, before he issued his final report, told Defendant Wagner he believed Siehl's blood was in a sample taken

from the bathroom doorframe and on a towel. *Id.* He told Defendant Wagner that some of the samples should be sent to a laboratory for DNA testing, at a cost of about $2,250.00. *Id.*

Rather than conducting the testing, representatives of the Johnstown Police Department, the Cambria County District Attorney's Office, and the Cambria County Coroner's Office engaged in multiple and time-consuming conversations about who would pay for such testing. *Id.* ¶ 65. During that time, Defendant Ermlick consumed all of the blood samples in the non-DNA testing he was conducting for the prosecution. *Id.* ¶ 66. Accordingly, there was no material left for testing. *Id.* ¶ 66. The inability to conduct critical DNA testing, which could have exonerated Siehl and inculpated the real killer, was the direct result of Cambria County's failure to adopt necessary policies and protocols concerning such testing. *Id.* ¶¶ 66-67.

### E. Siehl's Post-Conviction Litigation and Exoneration

Following closing arguments emphasizing the forensic evidence falsely connecting Siehl to the crime, on May 16, 1992, Siehl was convicted of first-degree murder. *Id.* ¶¶ 125-26. Siehl pursued post-trial, appellate and post-conviction relief. Twenty years after his conviction, in November 2012, post-conviction litigation led to discovery which resulted in the production for the first time in the history of the case Defendant Ermlick's notes from his midtrial testing of the L.A. Gear tennis shoes. *Id.* ¶ 131. Thereafter, additional investigative work resulted in production of Defendant Ermlick's lab notes from his original testing in July and August 1991. *Id.* ¶ 132. These notes provided conclusive evidence that Defendant Ermlick's report to prosecutors concerning the presumptive presence of blood on Siehl's shoes was false, and further, supported the conclusion that all forensic testing in the investigation was misleading and unreliable. *Id.* ¶¶ 133-34.

Based on this newly discovered evidence, and following the filing of an additional postconviction petition, a trial judge vacated Siehl's conviction. *Id.* ¶ 136. On October 13, 2016, the Pennsylvania Attorney General's office, following an investigation, announced it would not prosecute Siehl, and the charges against him were dismissed. *Id.* ¶ 137. In the wake of that announcement, the District Attorney of Cambria County assured the public that her office, which had previously employed Defendants Tulowitzki and Lovette, no longer employed anyone associated with Siehl's prosecution. *Id.* ¶ 4.

## II.    LEGAL STANDARD

The United States Court of Appeals for the Third Circuit summarized the standard to be applied in deciding motions to dismiss filed pursuant to Rule 12(b)(6):

> Under the "notice pleading" standard embodied in Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must come forward with "a short and plain statement of the claim showing that the pleader is entitled to relief." As explicated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a claimant must state a "plausible" claim for relief, and "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Although "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213 (quotation marks and citations omitted); *see also Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 117–18 (3d Cir. 2013).

*Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014).

In addition to the complaint, courts may consider matters of public record and other matters of which a court may take judicial notice, court orders, and exhibits attached to the complaint when adjudicating a motion to dismiss under Rule 12(b)(6). *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citing 5A Wright and

Miller, *Federal Practice and Procedure: Civil 2d,* § 1357; *Chester County Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir. 1990)). A court may also consider indisputably authentic documents. *Spruill v. Gillis,* 372 F.3d 218, 223 (3d Cir. 2004); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993); *Golden v. Cook,* 293 F. Supp.2d 546, 551 (W.D. Pa. 2003) ("[C]ourts are permitted to consider matters of which they may take judicial notice, including records and reports of administrative bodies, and publicly available records and transcripts from judicial proceedings 'in related or underlying cases which have a direct relation to the matters at issue.'") (citations omitted).

## III.    LEGAL ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

### A.    MOTION TO DISMISS FILED BY DEFENDANTS CAMBRIA COUNTY, TULOWITZKI AND LOVETTE (ECF NO. 24)

Plaintiff's § 1983 claims against these moving Defendants are as follows:

> Count III—Violation of *Brady v. Maryland* against Defendants Tulowitzki and Lovette;

> Count IV—Violation of Right to Counsel and Right to a Fair Trial against Defendants Tulowitzki and Lovette; and

> Count VII—Failure to Implement DNA Policies, Practices, and Procedures against Defendant Cambria County.

In support of their Motion to Dismiss, Defendants Tulowitzki and Lovette argue that they are entitled to absolute prosecutorial immunity for Plaintiff's assertions that they (1) failed to disclose exculpatory evidence in violation of court orders; and (2) interfered with Plaintiff's attorney-client relationship in violation of court orders. Defendant Cambria County argues that Plaintiff's allegations that it failed to implement policies and procedures regarding the testing of DNA evidence fails to state a claim under the municipal liability theory of failure to train.

Plaintiff responds that the actions of these prosecutors in violation of court orders were non-discretionary and properly classified as administrative in nature, and therefore not protected by immunity. Plaintiff further responds that because in 1991 it was widely known across the country that DNA testing could exonerate or inculpate criminal suspects in cases involving biological evidence, Cambria County's failure to train its officials on these policies and protocols evidenced its deliberate indifference to the constitutional rights of its criminal suspects.

1.  **Prosecutorial Immunity**

Prosecutors are entitled to absolute immunity from suit for actions taken in their role as advocates for the state. *Odd v. Malone*, 538 F.3d 202, 207-08 (3d Cir. 2008). Although that immunity is absolute within its scope, it is not all-encompassing. That is, prosecutors are not absolutely immune from suit based on investigative or administrative actions or for other

activities that fall entirely outside their role as advocates.  *Id.* 208, 211.  Therefore, challenged prosecutorial actions must be evaluated individually.

Siehl challenges the following actions of defendant prosecutors: 1) that Defendants Tulowitzki and Lovette interfered with Siehl's attorney-client relationship in violation of court orders and 2) that Defendants Tulowitzki and Lovette failed to disclose exculpatory evidence in violation of court orders.  (ECF No. 1 ¶¶ 146-49.)

a.　　Interference with the Attorney-Client Relationship in Violation of Court Orders

Relevant to this challenge to prosecutorial conduct, Plaintiff alleges that the trial court made clear in its findings and orders that the examination by the defense forensic expert was to be done with full protection for the privileged and confidential nature of that process.  That is, the trial court permitted the prosecution to have a representative present at the location of the examination solely for "chain of custody" purposes, and that the prosecution representative (Defendant Brant), was not permitted to interfere with "the expert's independent investigation for the defense."  (ECF No. 1 ¶ 96.)  Plaintiff further alleges, as set out above, that as a result of violating the court order, the prosecutors were given Brant's type-written notes concluding that this defense expert (Bennet) would "answer honestly that he found some incriminating evidence on the tennis shoe."[3]  (ECF No. 1 ¶ 104.)  The prosecutors informed the court that they intended to conduct a thorough cross examination of the defense expert.  As a result, Siehl's defense counsel decided not to present the expert for any purpose, and Siehl was unable to present any expert testimony on forensic evidence in his defense.  (ECF No. 1 ¶¶ 105-08.)

When a court order, by its terms, severely limits a prosecutor's discretion, the prosecutor's duty in the face of such an order is not to advocate, but to comply.  The prosecutor's duties, at that point, become ministerial or administrative, rather than advocative.  *Munchinski v.*

---

[3] The expert's conclusions in this regard were proven groundless in post-conviction litigation.  (ECF No. 1 ¶ 102.)

*Solomon*, No. 17-2633, 2018 WL 4090881, at *4 (Aug. 28, 2018) (citing *Munchinski v. Solomon*, 618 F. App'x 150, 155-56 (3d Cir. 2015) ("Insofar as the PCRA court's order did not require Warman to exercise any discretion to determine if any item was covered by the order, the order did not require the exercise of a prosecutorial function."); *Odd,* 538 F.3d at 214 ("We can imagine few circumstances under which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience."); *cf. Reid v. New Hampshire*, 56 F.3d 332, 337 (1st Cir. 1995) (holding than an order requiring the police to turn over "exculpatory" evidence left discretion to the prosecutors). Taking all of Plaintiff's allegations as true, as it must at this stage of the proceedings, the Court finds at the pleading stage that these Defendant prosecutors are not protected by absolute immunity regarding their alleged interference with the attorney-client relationship in violation of court orders.

      b.    <u>Failure to Disclose Exculpatory Evidence in Violation of Court Orders</u>

Here, the Plaintiff alleges that Defendant prosecutors failed to comply with the court's order that Defendant prosecutors provide to the defense all forensic evidence secured in the case. Plaintiff alleges that during trial, Defendant prosecutors directed Defendant Ermlick to conduct further testing of the L.A. Gear tennis shoes. Ermlick followed their directive and his findings would have been very helpful to the defense. Yet, in direct violation of the court's order, Defendant prosecutors failed to turn over these new forensic testing results to the defense, nor did they alert the court or the defense that this additional testing had been conducted. In addition, the prosecutors further directed Ermlick not to write a formal report regarding the new findings. Moreover, when asked by the court whether Ermlick had conducted additional testing,

the Defendant prosecutors denied that the testing had been done, knowing that the disclosure of Ermlick's latest findings would seriously undermine their theory of the case.

As discussed above, the Defendant prosecutors' failure to provide the results of all forensic testing to the defense was done in violation of a court order. The court order left no room for the Defendant prosecutors to exercise prosecutorial judgment or evaluation. Instead, the allegations of the Complaint suggest that they had a non-discretionary duty to abide by the court's order and to truthfully answer the court's inquiry relating to that order. At this point, their duties became administrative, rather than advocative. Taking all of Plaintiff's allegations as true, as it must at this stage of the proceedings, the Court finds at the pleading stage that these Defendant prosecutors are not protected by absolute immunity regarding their alleged violation of a court order to turn over all results relating to forensic testing in the case.

2.      **Municipal Liability**

Finally, Defendant Cambria County moves to dismiss the claim of municipal liability arguing that Plaintiff is unable to allege that the County had notice that its failure to implement policies and protocols concerning DNA testing of biological evidence would result in the violation of the constitutional rights of its criminal suspects.

In *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983. In so ruling, however, the Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, that is, through application of the doctrine of respondeat superior. Instead, the Court concluded that a governmental unit may be liable under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. *Id*.

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation. *Id.* at 690-91. A municipal policy is made when a decision-maker issues an official proclamation or decision. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), *quoted in*, *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). A custom or practice, however, may consist of a course of conduct so permanent and widespread that it has the force of law. *Andrews*, 895 F.2d at 1480. To establish municipal liability based upon a custom or practice, the plaintiff must demonstrate that the decision-maker had notice that a constitutional violation could occur and that the decision-maker acted with deliberate indifference to this risk. *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Finally, Plaintiff must show a causal connection between the custom or policy and the violation of the constitutional right. *Bielevicz v. Dubinon*, 915 F.2d 845, 850-51 (3d Cir. 1990). That is, a plaintiff must demonstrate an "affirmative link" or "plausible nexus" between the custom or practice and the alleged constitutional deprivation. *Bielevicz*, 915 F.2d at 850-51.

Where a pattern of constitutionally cognizable injury is not alleged, a Plaintiff may still make out a claim of § 1983 liability. That is, there may be cases where "the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). In this instance, it is important for the court to discuss whether

the Plaintiff has alleged the inference on all three issues. *Id.*

Here, Plaintiff has sufficiently alleged that the County caused the deprivation of his rights by its failure to employ policies and protocols regarding the DNA testing of biological evidence at a time when law enforcement agencies throughout the United States knew that such testing could provide conclusive evidence of guilt or innocence in a criminal case. Plaintiff further alleges that the County's failure to establish guidelines as to who would pay for the testing after it was determined that such testing was necessary, delayed the DNA testing until all blood samples were consumed in non-DNA testing. (ECF No. 1 ¶¶ 61-66.) Plaintiff avers as follows:

> Had investigating officers conducted or arranged for DNA testing, that testing could have exonerated Mr. Siehl as none of his blood or other biological material was present in an area that would show that he was the murderer. Further, that testing could have provided evidence as to the identity of the real killer.

(ECF No. 1 ¶ 67.)

Taking all of Plaintiff's allegations as true, as it must at this stage of the proceedings, the Court finds at the pleading stage that Plaintiff has sufficiently alleged a claim for municipal liability against Cambria County.

### B. <u>MOTION TO DISMISS BY DEFENDANTS BRANT AND ERMLICK (ECF NO. 28)</u>

Plaintiff's claims against these moving Defendants are as follows:

Count I—Malicious Prosecution

Count II—Fabrication of Evidence

Count III—Violation of *Brady v. Maryland*

Count IV—Violation of Right to Counsel and Right to a Fair Trial

Count V—Brant only—Right to a Fair Trial for the intentional/reckless use of all forensic evidence

Count VIII—State Claim for Malicious Prosecution—the Court recognizes that Plaintiff voluntarily dismisses the supplemental state law claim for malicious prosecution against Defendants Brant and Ermlick. (ECF No. 36 at 3 n.1.)

1.  Absolute Immunity Relating to Testimony at Trial

Defendants Brant and Ermlick first argue that they are protected by absolute immunity for any claims relating to their testimony at Plaintiff's criminal trial. Plaintiff acknowledges that they are protected for any false trial testimony, but emphasizes that Plaintiff's claims are directed to Defendants' conduct occurring before and/or outside the context of trial testimony, and therefore, Defendants' Motion to Dismiss on this point must be denied. The Court agrees. Most, if not all, of Plaintiff's allegations directed towards these Defendants concern facts and circumstances outside the context of criminal trial testimony. Therefore, general principles of witness immunity are inapplicable here.

2.  Qualified Immunity

Next, Defendants Brant and Ermlick argue that they are protected by qualified immunity. The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, government officials are protected by immunity in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the alleged constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In its discretion, a court may

decide which of the two-pronged analysis it will initially undertake in light of the circumstances presented by the case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. *Id.* at 492 (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). *See also Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992) ("Objective reasonableness is measured by the amount of knowledge available to the officer at the time of the alleged violation."). The burden of establishing the affirmative defense of qualified immunity is on the defendant. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

Importantly, qualified immunity issues, such as whether there was a constitutional violation, may require the kind of factual context that is available only on summary judgment or at trial. But when the defense of qualified immunity is raised on a motion to dismiss, the court must address the issue and accept all allegations of the complaint as true in applying the analysis. *See Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) ("[Q]ualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint."); *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014) (focus of qualified immunity analysis is whether facts alleged fall within elements of claim

and whether it would be clear to a reasonable officer that his conduct was unlawful under circumstances presented).

      a.      Counts I and II—Malicious Prosecution and Fabricated Evidence

Defendants argue that they are entitled to qualified immunity relating to Plaintiff's claims for malicious prosecution and fabricated evidence because Plaintiff only complains of "unreasonable or incorrect forensic conclusions, with which [Plaintiff's] experts disagree." (Defendants' Brief in Support of Motion to Dismiss, ECF No. 29 at 12.)  Defendants continue that "[f]reedom from wrong opinions is not a right at all," and that no reasonable officer under the circumstances "would have understood or realized that making a mistake in testing evidence, or issuing a conclusion that was questionable or wrong . . . would amount to a constitutional violation."  (ECF No. 29 at 12-13.)  Defendants reiterate these arguments in attempting to establish that Plaintiff has failed to state a prima facie case of malicious prosecution and fabricated evidence.

As noted by Plaintiff in his Response, the allegations of the Complaint go much further than suggested by Defendants.  Plaintiff alleges that Defendants acted intentionally, or at a minimum, recklessly, in reporting false forensic conclusions to support the prosecution's theory of the case.  Specifically, Plaintiff alleges with sufficient specificity why Brant's report on thumbprint deterioration was intentionally or recklessly false (ECF No. 1 ¶¶ 37-41).  Plaintiff further details why Ermlick's report on blood spatter evidence was intentionally or recklessly false (ECF No. 1 ¶¶ 44-49).  Likewise, Plaintiff sufficiently alleges why Ermlick's report that the presumptive blood stain on Plaintiff's tennis shoes was intentionally or recklessly false (ECF No. 1 ¶¶ 56-60).  Moreover, Plaintiff's allegation that Brant knowingly violated a court order and Ermlick's silence when prosecutors lied to the trial judge as to whether any additional testing

was done, support Plaintiff's contentions that both Defendants acted knowingly, intentionally and maliciously and in bad faith in providing prosecutors with false forensic conclusions. Taking all of Plaintiff's allegations as true, and granting Plaintiff every favorable inference therefrom, Plaintiff has alleged plausible claims for malicious prosecution and fabrication of evidence pursuant to *Twombly*.[4]

Defendants advance no argument as to the second prong of the qualified immunity analysis- was there clearly established law- in light of their argument that there was no constitutional violation. In evaluating the second prong of the analysis, the Court must deny qualified immunity at this stage of the proceedings. In support of his claims for malicious prosecution and fabrication of evidence, Plaintiff describes Defendants' conduct that supported the initiation of charges against him: 1) Brant's communication of the statement, knowing it was false, that the latent print on the showerhead was left 24-36 hours before it was located, and the subsequent report that the print was left by Plaintiff; 2) Ermlick's false report that the blood stain on the doorframe was left by Plaintiff; and 3) Ermlick's false report that there was a "presumptive" blood stain on Plaintiff's shoes. If Plaintiff's allegations are proved to be true through discovery or at trial, Defendants' conduct would constitute the violation of clearly established law that would have been apparent to reasonable police forensic investigators and scientists in 1991: the right to be free from arrest except on probable cause. *See, e.g., Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (as of 1989, "the right to be free from arrest except on probable cause was clearly established."). *See generally Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (Probable cause may be subverted where an officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions

_____

[4] Defendants make no further arguments as to why Plaintiff has failed to allege these claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

that create a falsehood" and "[s]uch statements or omissions are material, or necessary, to the finding of probable cause.") Consequently, the Motion to Dismiss these claims on the grounds of qualified immunity must be denied at this time.

      b.      Counts III and IV—*Brady* and Fair Trial Violations

In support of their Motion to Dismiss Counts III and IV (*Brady* and fair trial violations), Defendants argue that they are protected by qualified immunity because police officers were not subject to *Brady*[5] at the time of Plaintiff's trial and conviction in 1991 and 1992. In addition, Defendants argue that they have been unable to locate a decision that would put Defendant Brant on notice that his alleged observations during the criminal defense expert's (Bennett) forensic evaluation violated the Constitution.

Plaintiff responds that both of Defendants' arguments are incorrect. Plaintiff concedes that *Brady* did not apply to police officers at the time of Plaintiff's trial and conviction. Plaintiff contends, however, that *Brady* is not the source of Plaintiff's claims against Brant and Ermlick. Instead, Plaintiff argues that he relies on long established precedent establishing that the Due Process Clause prohibits officers from engaging in deliberate deception and suppression of evidence, citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) and *Pyle v. Kansas*, 317 U.S. 213, 216 (1942).

Plaintiff then directs the Court to *Haley v. City of Boston,* where the First Circuit Court of Appeals acknowledged the proscription originating from *Mooney* and *Pyle*, stating that "[d]eliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights." Haley, 657 F.3d 39, 49 (2011). The *Haley* court concluded that the context of

---

[5] In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process." 373 U.S. 83, 87 (1963). This duty to disclose applies "irrespective of the good faith or bad faith of the prosecution." *Id.*

*Pyle* "makes it apparent that this holding encompasses the misconduct of police officers[,]" and that further progeny clearly established the law regarding concealment by 1972. *Id.* at 49-52 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (*Mooney* and *Pyle* extended when "the State, although not soliciting false evidence, allows it to go uncorrected when it appears."); *Miller v. Pate*, 386 U.S. 1, 7 (1967) (United States Supreme Court "reaffirmed that it would countenance 'no deviation from th[e] established principle' developed" in *Mooney* and *Pyle*)).

The Court must again deny qualified immunity at this stage of the proceedings. According to the Complaint, Brant knew that his conclusion regarding the showerhead fingerprint was false. Ermlick knew that his conclusions regarding the blood splatter and presumptive bloodstains on Plaintiff's shoes were false, along with his mid-trial testing showing that the tennis shoes actually corroborated Plaintiff's statement to police. Although Plaintiff invokes *Brady* in Count III, he also invokes his due process protections under the Fourteenth Amendment which is sufficient to state a claim pursuant to *Mooney* and its progeny. Therefore, Plaintiff's allegations, if true, would constitute a violation of clearly established law that would have been apparent to a reasonable officer in 1991.

With regard to Defendants' statement that they could uncover no precedent that would have put Defendant Brant on notice that his alleged observations during the Bennett forensic examination violated the Constitution, Plaintiff directs the Court to Third Circuit caselaw holding that the government may not interfere with confidential communications between members of the defense team, citing *United States v. Rispo*, 460 F.2d 965, 976-78 (1972) and *United States v. Levy,* 577 F.2d 200, 207-210 (3d Cir. 1978). In *Rispo,* the Third Circuit held that intrusion by the government into the attorney-client relationship violated due process where a paid government informant participated in a joint trial as a "sham" defendant, and the

informer's court-appointed counsel (who was not aware of the deception) conferred with the co-defendants' counsel concerning trial strategy. *Id.* at 977-78. In *Levy*, the United States Court of Appeals held that the criminal defendant's Sixth Amendment right to counsel was violated when a government informant codefendant disclosed defense strategy to the government. *See also United States v. Crow Dog*, 532 F.2d 1182, 1197-98 (8th Cir. 1976) (quoting and adopting *United States v. Cooper*, 397 F. Supp. 227 (D. Neb. 1975) (violation of Sixth Amendment right to counsel where government informant gains information relating to charge against criminal defendant by intruding into attorney-client relationship)).

Therefore, the Court must deny qualified immunity at this stage of the proceedings on Plaintiff's claim that these Defendants interfered with the defense team by closely observing the criminal defense expert's forensic evaluation and providing confidential information about that evaluation to the prosecution. In light of this third Circuit precedent, these allegations, if true, would constitute a violation of clearly established law that would have been apparent to a reasonable officer in 1991.

      c.      Count V—Fair Trial Right under the Fifth and Fourteenth Amendments

Finally, Defendants move to dismiss Count V directed to Defendant Ermlick. Count V concerns Ermlick's consumption of all forensic evidence before it could be submitted for DNA testing "knowing that doing so would preclude Mr. Siehl from obtaining evidence which would have exonerated him." (ECF No. 1 ¶150.) Again, Defendants contend that they could uncover no caselaw dealing with facts where a forensic examiner working with small blood samplings violated a criminal defendant's constitutional rights when he used up the evidence in the course of other biological testing. (ECF No. 29 at 16.) Plaintiff responds that as early as 1988, the United States Supreme Court addressed this issue holding that due process is violated when a

law enforcement officer fails to preserve biological evidence in "bad faith" citing *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). Plaintiff's averments describe Ermlick's understanding of the importance of DNA testing when he suggested to Wagner that some of the samples should undergo DNA testing. (Complaint ¶ 63.) Yet, Ermlick "deliberately and recklessly consumed all of the blood samples in his non-DNA testing." (Id. ¶ 65.)

Here, taking all of Plaintiff's allegations as true, a reasonable officer in 1991 would have known that failing to preserve biological evidence in "bad faith" violated a criminal defendant's constitutional rights. At this stage of the proceedings, the Court must deny qualified immunity.

## IV. CONCLUSION

For the reasons discussed above, the Motion to Dismiss filed by Defendants Cambria County, Tulowitzki, and Lovette (ECF No. 24) will be denied. The Motion to Dismiss filed by Defendants Brant and Ermlick (ECF No. 28) will be denied. All Motions to Dismiss on the grounds of absolute or qualified immunity will be denied without prejudice to raising the issue after the close of discovery on summary judgment. The Court also acknowledges Plaintiff's voluntary dismissal of the supplemental state law claim at Count VIII against Defendants Brant and Ermlick.

An appropriate Order will follow.

Dated: February 13, 2019

BY THE COURT

_____
LISA PUPO LENIHAN
United States Magistrate Judge