# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEVIN SIEHL,                )
                                  )
            Plaintiff,          )       Civil Action No. 18-77J
                                  )
            v.                  )
                                  )
CITY OF JOHNSTOWN, CAMBRIA   )       Magistrate Judge Lenihan
COUNTY, DAVID TULOWITZKI,    )
DANIEL LOVETTE, MERRILL BRANT, )
SCOTT ERMLICK, ANGELO         )
CANCELLIERE, and LAWRENCE    )
WAGNER,                     )       Re: ECF No. 34
                                  )
            Defendants.     )

## <u>MEMORANDUM OPINION</u>

Presently before the Court in this civil rights action filed pursuant to 42 U.S.C. § 1983 is a Motion to Dismiss filed by Defendants Cancelliere, Wagner, and the City of Johnstown. (ECF No. 34.)  The underlying facts and circumstances concern the alleged misconduct of law enforcement officers from multiple agencies—Defendant City of Johnstown Police Department ("Defendant Johnstown") and its police officers Angelo Cancelliere ("Cancelliere") and Lawrence Wagner ("Wagner");[1] Pennsylvania State Police Trooper Merrill Brant ("Brant") and Pennsylvania State Police forensic scientist supervisor Scott Ermlick ("Ermlick"); Cambria County's District Attorney's Office ("Defendant Cambria County") and its Assistant District Attorneys David Tulowitzki ("Tulowitzki") and Daniel Lovette ("Lovette").  These named Defendants allegedly caused the wrongful conviction and incarceration of Plaintiff Kevin Siehl ("Plaintiff" or "Mr. Siehl") for the murder of his wife in 1991 for which he spent 25 years in prison.  On July 14, 2016, Plaintiff's conviction was vacated and the criminal charges against

---

[1] Defendants Cancelliere and Wagner are sued in their individual capacities only.  (Complaint, ECF No. 1 ¶¶ 14 & 15.)

him were dismissed.  For the reasons discussed below, the Motion to Dismiss filed by Defendants Cancelliere, Wagner and the City of Johnstown will be denied.  The Motion to Dismiss on the grounds of qualified immunity will be denied without prejudice to raising the issue again after the close of discovery on summary judgment.

## I.    RELEVANT FACTUAL ALLEGATIONS

In his responsive brief to the Motion to Dismiss (ECF No. 41), Plaintiff summarizes the allegations of the Complaint (ECF No. 1) as follows:

### A.    The Murder, Forensic Evidence, and alleged Fabricated Connection to Plaintiff

Christine Siehl was found dead in her bathtub on July 14, 1991. Complaint ¶¶ 18-19. Two Johnstown police officers, Defendant Sergeant Angelo Cancelliere and Defendant Investigator Lawrence Wagner, were assigned to investigate the case.  On arrival at Christine Siehl's apartment, they found signs of a violent struggle. *Id.* ¶¶ 20-22. In the bathroom, they located glass from a broken mirror and kitty litter strewn about the floor and in the bathtub. *Id.* ¶ 22. There was a large amount of blood on the floor, smeared on the wall, and spattered in other areas, including the bathroom doorframe. *Id.* Based on her position, investigators believed Christine Siehl had been placed in the bathtub after she was killed and that the showerhead had been adjusted to spray water onto her body. *Id.* ¶ 23.

Defendants Cancelliere and Wagner expected they would be able to locate important forensic evidence in the bathroom so they requested assistance from the Pennsylvania State Police. *Id.* ¶ 24. The next day, Defendant Brant, a Pennsylvania State Police trooper, went to the apartment to process the scene. *Id.* ¶ 25. He recovered a single latent fingerprint on the showerhead, a number of blood samples from the bathroom, and other items that appeared to have blood on them, including a towel. *Id.* ¶¶ 26-27.

Defendants Cancelliere and Wagner decided to focus their investigation on Mr. Siehl. *Id.* ¶¶ 28-30. They made this decision despite the fact they were aware of at least two other people who had motives to harm Christine Siehl: Frank Willis, a man who had been in a relationship with Christine Siehl while she was married to Plaintiff; and Robert "Bobby" Prebahalla, Plaintiff's nephew, who was known to have stated that he would kill Christine Siehl if she ever did anything to hurt Plaintiff. *Id.* ¶ 31. Cancelliere and Wagner considered Siehl their prime suspect and informed every other law enforcement officer working on the investigation of their belief that Siehl was the murderer. *Id.* ¶¶ 30-32. Based on this belief, the Defendants jointly agreed to seek out evidence they could use to buttress the case against Siehl. *Id.* ¶ 33.

In the weeks that followed the murder, Defendants Brant and Ermlick produced reports asserting that forensic evidence pointed to Siehl's guilt. They relied on three pieces of evidence. First, Defendant Brant issued a report stating that the latent print found on the showerhead belonged to Siehl, and later, Brant informed the other Defendants that because the fingerprint had not deteriorated it must have been left within the 24 to 36 hours before it was found. *Id.* ¶¶ 35-36. This assertion concerning the timing as to when the fingerprint was left was critical to the investigating officers as they believed Christine Siehl was killed at approximately 1:30 a.m. on July 13, a time closely approximating Defendant Brant's conclusion. *Id.* ¶¶ 68-70. Defendant Brant's assertions regarding the print, however, were false. *Id.* ¶ 37. Expert analysis conducted during Siehl's post-conviction proceedings confirmed that there is no scientific support for the proposition that a non-deteriorated latent print must be of recent origin, and in any event, the print found on the showerhead was not a match to Siehl. *Id.* ¶¶ 37, 39.

Second, Defendant Ermlick, a forensic scientist supervisor in the Pennsylvania State Police Greensburg Regional Laboratory, issued a report stating that one of the blood samples

found on the bathroom door frame matched Siehl's blood. *Id.* ¶¶ 42-46. This assertion supported the investigating officers' theory that the killer had been wounded while repeatedly stabbing Christine Siehl and had left blood at the scene. *Id.* ¶ 47. Ermlick's assertion, however, was false. Similar to the latent print left on the showerhead, expert analysis during Siehl's post-conviction proceedings showed that, given the orientation of the blood spatter, found in a nearly perfect parallel left-to-right configuration on the doorframe next to a blood stain attributed to Christine Siehl, the stain could not have come from Siehl. *Id.* ¶ 48.

The third piece of forensic evidence was Siehl's L.A. Gear tennis shoes, which Cancelliere and Wagner claimed were stained with blood. *Id.* ¶¶ 50-51. After the shoes were obtained pursuant to a search warrant, *Id.* ¶¶ 52-53, Ermlick conducted testing on them and issued a report stating that the "shoes" were "presumptively positive" for blood, an assertion supporting Cancelliere and Wagner's theory that Siehl had stained his shoes while in the blood-soaked bathroom. *Id.* ¶¶ 56-57. The assertion in the report was false, as evidenced by Ermlick's contemporaneous lab notes (never produced to Siehl until more than twenty years later in post-conviction litigation). *Id.* ¶¶ 58-59. The notes confirmed that there was no evidence of any blood on *both* shoes, as the right shoe was "unremarkable." *Id.* 58. Further, though the notes reference a "very light smear in the heal area" of the left shoe, the notes show that Defendant Ermlick could not confirm that the "smear" was human blood. *Id.*

Each of Brant's and Ermlick's false and misleading assertions in these reports was provided in an effort to support Cancelliere and Wagner's position that Siehl had murdered Christine Siehl. *Id.* ¶¶ 38-39, 41, 49, 60. Cancelliere and Wagner, intent on proceeding with a prosecution against Plaintiff, maintained that position despite knowing (or, at a minimum,

recklessly disregarding the fact) that Brant and Ermlick's forensic reports were false and/or fabricated. *Id.* ¶¶ 88, 90.

**B. Cancelliere and Wagner's False Report Aimed at Undermining Siehl's Alibi**

Less than two weeks after Christine Siehl's body was located, Defendant Wagner spoke to a witness who was present in the apartment next to Christine Siehl's apartment on the night of July 12-13, 1991. *Id.* ¶ 68. Based on her report of a loud commotion in Christine Siehl's apartment, Cancelliere and Wagner reached the conclusion that Christine Siehl was murdered at approximately 1:30 a.m. on July 13, 1991. *Id.* ¶ 70. On the night of July 14, 1991, just hours after Christine Siehl's body was located, Cancelliere and other officers interviewed Plaintiff about his whereabouts over the previous several days. *Id.* ¶ 71. Plaintiff truthfully told Cancelliere that he had picked Christine Siehl up from work at approximately 10:30 p.m. on July 12, 1991, that they had gone to two bars, and that Christine Siehl had dropped Plaintiff off at his parents' home. *Id.* ¶ 72. Plaintiff told Cancelliere that he was not certain about the specific time when he arrived home, but he estimated that it was some time after 1:00 a.m. and well before 2:00 a.m. *Id.* ¶ 73. He specifically explained he was home well before 2:00 a.m. because he recalled that Christine Siehl intended to meet with Frank Wills at another bar before that bar's 2:00 a.m. last call. *Id.* ¶ 74. Based on Mr. Siehl's account, Cancelliere and Wagner knew that Plaintiff's parents could have corroborated Plaintiff's account, but they made no effort to interview them. *Id.* ¶ 75. Instead of investigating Plaintiff's whereabouts, Cancelliere and Wagner prepared a report concerning the interview with Plaintiff and stated that he informed them he had been with Christine Siehl until between 2:00 a.m. and 3:00 a.m. on July 13, 1991. *Id.* ¶ 76. This statement was false. Plaintiff never told Cancelliere, Wagner, or any other investigating officer that he had been with Christine Siehl until between 2:00 a.m. and 3:00 a.m. *Id.* ¶ 77. Though it shifted

Plaintiff's reported timeframe by just one hour, this false statement was highly material to Cancelliere and Wagner. The timeframe included in their report allowed them to place Plaintiff in Christine Siehl's presence at the time when they believed she was killed. *Id.* ¶ 78.

Had Cancelliere and Wagner conducted a proper investigation, they would have known early on that at least two witnesses corroborated Plaintiff's account. Plaintiff's father, Alonzo Siehl, told investigators that Plaintiff was in his home by 1:00 a.m. on July 13, 1991, and that he did not leave again that night. *Id.* ¶ 79. Additionally, a neighbor of Plaintiff's family, Freddie Cooper, recalled that Plaintiff arrived home at approximately 1:00 a.m. *Id.* ¶ 80. Notwithstanding this contradictory information, Cancelliere and Wagner continued to assert falsely that Plaintiff told them he was with Christine Siehl until between 2:00 a.m. and 3:00 a.m. and that his presence with her showed that he was the killer. *Id.* ¶ 81.

**C. Cancelliere and Wagner Ignore the Inculpatory Conduct of Other Suspects**

In the same time period when Cancelliere and Wagner created false reports about Plaintiff's statements and received forensic reports from defendants Brant and Ermlick which they knew to contain false conclusions, Cancelliere and Wagner repeatedly ignored information pointing to the guilt of other suspects. Cancelliere and Wagner knew that both Frank Wills and Bobby Prebahalla had motives to kill Christine Siehl. Wills was dating Christine Siehl while she was married to Plaintiff. *Id.* ¶ 82. And Prebahalla was known to strongly dislike Christine Siehl and had threatened to kill her in the past. *Id.*

Following the discovery of Christine Siehl's body, Prebahalla's conduct was especially suspicious. On July 14, 1991, the day the body was recovered, Prebahalla called his girlfriend and told her that he and other people would be charged with murder and that she (his girlfriend) should lie to police and state that he had been in Pittsburgh. *Id.* ¶ 83. Five days later, Cancelliere

and Wagner brought Prebahalla to the Johnstown Police Department for an interview. He was "extremely nervous," his hands were "trembling," and he was noted to have shaky speech. He said to the officers, "Am I going to jail?" and "I don't want to go to jail." *Id.* ¶ 84. He also said "I knew this was going to happen." *Id.* This conduct continued beyond the initial interview. Throughout the investigation, Cancelliere and Wagner asked Prebahalla to submit to a polygraph examination. On at least two occasions, in August 1991 and November 1991, he agreed to participate but, both times, he refused the examination at the last moment. *Id.* ¶ 85. Despite this pattern of Prebahalla's highly incriminating behavior, Cancelliere and Wagner continued gathering false and fabricated evidence to support a prosecution of Plaintiff. *Id.* ¶ 86.

**D. Cancelliere and Wagner Submit a False Affidavit in Support of Plaintiff's Arrest**

By late August 1991, Cancelliere and Wagner had collected reports that purported to identify four pieces of information pointing to Plaintiff's guilt: Brant's report that Plaintiff's fingerprint was left on Christine Siehl's showerhead close in time to the discovery of her body, Ermlick's report that Plaintiff's blood was found on the bathroom doorframe, Ermlick's report that blood was found on Plaintiff's tennis shoes, and Cancelliere and Wagner's own report that Plaintiff admitted to being in Christine Siehl's presence at the time they believed the murder to have occurred. *Id.* ¶ 87. Cancelliere and Wagner knew that each of these reports was false, and in fact, that the information outlined in the reports did not in any way provide cause to believe that Plaintiff was the murderer. *Id.* ¶ 87.

Despite their knowledge as to the falsity of this information, on August 30, 1991, Cancelliere and Wagner swore out an affidavit of probable cause in support of a warrant to arrest Mr. Siehl for the murder. *Id.* ¶ 88. The affidavit cited as "facts" supporting probable cause the

physical evidence obtained by Brant at the crime scene, laboratory analysis described in Ermlick's report, and statements from witnesses and Plaintiff—all of which Cancelliere and Wagner knew did not support any conclusion that Plaintiff was involved in the crime. *Id.* ¶¶ 88-89. As a result of Cancelliere and Wagner's efforts to initiate a baseless prosecution of Plaintiff through the submission of this affidavit, a warrant was issued for Plaintiff's arrest and he was formally charged with the crime. *Id.* ¶ 91. The assigned prosecutors, Defendants Tulowitzki and Lovette, later informed Plaintiff's defense counsel that they would seek the death penalty for Mr. Siehl.

### E. Defendants' Interference with the Defense Camp

Once Plaintiff was charged with capital murder, his attorneys recognized that the prosecution would be based on forensic evidence and sought permission from the trial court to retain a forensic scientist to consult with them about the case. *Id.* ¶ 93. The court authorized the retention of an expert as part of the defense team. *Id.* ¶ 94. Defense counsel asked the prosecution to turn over evidence so that the expert could conduct an independent investigation, and the court granted that request. *Id.* ¶¶ 95-96. The court directed that the prosecution could have a representative present during the defense expert's investigation for the limited purpose of preserving the chain of custody, but the court specifically ordered that the prosecution's representative must not be "looking over the [expert's] shoulder" in any manner that would interfere with the expert's independent investigation for the defense. *Id.* ¶ 96.

Thereafter, the Defendants, including Cancelliere and Wagner, worked jointly to have Defendant Brant violate the trial court's order intended to protect the confidentiality of the defense expert's examination of the forensic evidence by making close and repeated observations of the expert's work. *Id.* ¶¶ 97-100; *see also id.* ¶¶ 32-33, 108 (alleging joint action of all

defendants to falsely prosecute Mr. Siehl). During the examination, Brant concluded that the defense expert had found inculpatory evidence on Plaintiff's tennis shoes. *Id.* 101-04. The defense expert had, in fact, informed Mr. Siehl's defense counsel that the shoes showed evidence supporting the prosecution's belief that Plaintiff committed the murder. *Id.* ¶ 101. The expert's conclusions in this regard were erroneous and were later proven groundless in postconviction litigation. *Id.* ¶ 102. At the time of trial, though, the prosecutors used Brant's report concerning the defense expert's faulty conclusions to promote the prosecution's strategic advantage; as a result, Mr. Siehl's defense counsel decided not to present the expert's testimony on any issue. *Id.* ¶¶ 103-07. Thus, the Defendant officers' actions in interfering with the defense team's confidential expert evaluation resulted in Mr. Siehl's inability to defend himself with any expert testimony on the forensic evidence in the case. *Id.* ¶ 108.

### F. Mr. Siehl's Post-Conviction Litigation and Exoneration

Following closing arguments which emphasized the forensic evidence falsely connecting Plaintiff to the crime, on May 16, 1992, Mr. Siehl was convicted of first-degree murder. *Id*. ¶¶ 125-26. After the guilty verdict, Mr. Siehl pursued post-trial, appellate, and post-conviction relief. Twenty years after his conviction, in November 2012, post-conviction litigation led to discovery which resulted in the production for the first time in the history of the case Defendant Ermlick's notes from his mid-trial testing of the L.A. Gear tennis shoes. *Id.* ¶ 131. Thereafter, additional investigative work resulted in the production of Defendant Ermlick's lab notes from his original testing in July and August 1991. *Id.* ¶ 132. These notes provided conclusive evidence that Ermlick's report to prosecutors concerning the presumptive presence of blood on Mr. Siehl's shoes was false, and further supported the conclusion that all of the forensic testing in the investigation was misleading and unreliable. *Id.* ¶¶ 133-34.

Based on this newly discovered evidence, and following the filing of an additional

postconviction petition, a trial judge vacated Plaintiff's conviction. *Id.* ¶ 136. On October 13,

2016, the Pennsylvania Attorney General's office, after a comprehensive investigation,

announced it would not prosecute Mr. Siehl, and the charges were dismissed. *Id.* ¶ 137.

## II.    LEGAL STANDARD

The United States Court of Appeals for the Third Circuit summarized the standard to be

applied in deciding motions to dismiss filed pursuant to Rule 12(b)(6):

> Under the "notice pleading" standard embodied in Rule 8 of the
> Federal Rules of Civil Procedure, a plaintiff must come forward
> with "a short and plain statement of the claim showing that the
> pleader is entitled to relief." As explicated in *Ashcroft v. Iqbal*, 556
> U.S. 662, 678 (2009), a claimant must state a "plausible" claim for
> relief, and "[a] claim has facial plausibility when the pleaded
> factual content allows the court to draw the reasonable inference
> that the defendant is liable for the misconduct alleged." Although
> "[f]actual allegations must be enough to raise a right to relief
> above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550
> U.S. 544, 555 (2007), a plaintiff "need only put forth allegations
> that raise a reasonable expectation that discovery will reveal
> evidence of the necessary element." *Fowler*, 578 F.3d at 213
> (quotation marks and citations omitted); *see also Covington v. Int'l
> Ass'n of Approved Basketball Officials*, 710 F.3d 114, 117–18 (3d
> Cir. 2013).

*Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014).

In addition to the complaint, courts may consider matters of public record and other

matters of which a court may take judicial notice, court orders, and exhibits attached to the

complaint when adjudicating a motion to dismiss under Rule 12(b)(6). *Oshiver v. Levin,

Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citing 5A Wright and

Miller, *Federal Practice and Procedure: Civil 2d,* § 1357; *Chester County Intermediate Unit v.

Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir. 1990)).  A court may also consider

indisputably authentic documents.  *Spruill v. Gillis,* 372 F.3d 218, 223 (3d Cir. 2004); *Pension

*Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993); *Golden v. Cook,* 293 F. Supp.2d 546, 551 (W.D. Pa. 2003) ("[C]ourts are permitted to consider matters of which they may take judicial notice, including records and reports of administrative bodies, and publicly available records and transcripts from judicial proceedings 'in related or underlying cases which have a direct relation to the matters at issue.'") (citations omitted).

## III.    LEGAL ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

### A.    MOTION TO DISMISS FILED BY DEFENDANTS CANCELLIERE AND WAGNER

Plaintiff's § 1983 claims against these moving Defendants are as follows:

Count I—Malicious Prosecution

Count II—Fabrication of Evidence

Count III—Violation of *Brady v. Maryland*

Count IV—Violation of Right to Counsel and Right to a Fair Trial

Count VIII—State law claim for Malicious Prosecution[2]

In support of their Motion to Dismiss, Defendants Cancelliere and Wagner argue that they are protected by qualified immunity as to all claims. The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, government officials are protected by immunity in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the alleged constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In its discretion, a court may decide which of the two-pronged analysis it will initially undertake in light of the circumstances presented by the case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. *Id.* at 492

---

[2] Unlike Defendants Brant and Ermlick, Plaintiff has not voluntarily dismissed his state law claim for malicious prosecution as to these moving Defendants, Cancelliere and Wagner.

(internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). *See also Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992) ("Objective reasonableness is measured by the amount of knowledge available to the officer at the time of the alleged violation."). The burden of establishing the affirmative defense of qualified immunity is on the defendant. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

Importantly, qualified immunity issues, such as whether there was a constitutional violation, may require the kind of factual context that is available only on summary judgment or at trial. But when the defense of qualified immunity is raised on a motion to dismiss, the court must address the issue and accept all allegations of the complaint as true in applying the analysis. *See Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) ("[Q]ualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint."); *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014) (focus of qualified immunity analysis is whether facts alleged fall within elements of claim and whether it would be clear to a reasonable officer that his conduct was unlawful under circumstances presented).

### 1. Malicious Prosecution and Fabricated Evidence

Defendants argue that Plaintiff fails to allege facts to support the lack of probable cause for his arrest and malice. Plaintiff responds that Defendants mischaracterize the factual allegations of his Complaint and misstate the law.

Here, Plaintiff alleges that Defendants' affidavit of probable cause was based on four pieces of evidence: 1) the latent print on the showerhead, that it was left 24-36 hours before it was located, and the subsequent report that the print was left by Plaintiff; 2) the report that the

blood stain on the doorframe was left by Plaintiff; 3) the report that there was a "presumptive" blood stain on Plaintiff's shoes; and 4) Plaintiff's presence with Christine Siehl around the time of the murder. Plaintiff alleges that the moving Defendants *knew or recklessly disregarded* that all of these allegations in the affidavit of probable cause were false and/or fabricated during the course of the investigation. Complaint ¶¶ 87-88. The allegations of the Complaint, considered in their entirety, suggest the concerted activity of Defendants Cancelliere, Wagner, Brant and Ermlick to create false evidence in order to charge Plaintiff with the murder of Christine Siehl. On a motion to dismiss, the Court must take all of these allegations as true and construe all inferences in favor of the Plaintiff. Therefore, the Court must find at this stage of the proceedings that Plaintiff's Complaint establishes a lack of probable cause and malice.[3]

Moreover, if Plaintiff's allegations are proved to be true through discovery or at trial, Defendants' conduct would constitute the violation of clearly established law that would have been apparent to reasonable police officers in 1991: the right to be free from arrest except on probable cause. *See, e.g., Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (as of 1989, "the right to be free from arrest except on probable cause was clearly established."). *See generally Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (Probable cause may be subverted where an officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood" and "[s]uch statements or omissions are material, or necessary, to the finding of probable cause.") Consequently, the Motion to Dismiss these claims on the grounds of qualified immunity must be denied at this time.

---

[3] With regard to the fabrication of evidence claim, Defendants argue that the moving Defendants cannot be held responsible for the forensic evidence handled by Brant and Ermlick. As noted by the above discussion, Plaintiff plausibly alleges that the forensic reports were the product of joint conduct by Brant, Ermlick, and these moving Defendants. Plaintiff further plausibly alleges that these Defendants falsified Plaintiff's statements as to when he left Christine Siehl on the night of the murder.

2.      *Brady* and Due Process Violations

In support of their Motion to Dismiss Count III, Defendants argue that they are protected by qualified immunity because police officers were not subject to *Brady*[4] at the time of Plaintiff's trial and conviction in 1991 and 1992.  In response, Plaintiff concedes that *Brady* did not apply to police officers at the time of Plaintiff's trial and conviction.  Plaintiff contends, however, that *Brady* is not the source of Plaintiff's claims against Cancelliere and Wagner. Instead, Plaintiff argues that he relies on long established precedent establishing that the Due Process Clause prohibits officers from engaging in deliberate deception and suppression of evidence, citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) and *Pyle v. Kansas*, 317 U.S. 213, 216 (1942).

Plaintiff then directs the Court to *Haley v. City of Boston,* where the First Circuit Court of Appeals acknowledged the proscription originating from *Mooney* and *Pyle*, stating that "[d]eliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights."  Haley, 657 F.3d 39, 49 (2011).  The *Haley* court concluded that the context of *Pyle* "makes it apparent that this holding encompasses the misconduct of police officers[,]" and that further progeny clearly established the law regarding concealment by 1972.  *Id.* at 49-52 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (*Mooney* and *Pyle* extended when "the State, although not soliciting false evidence, allows it to go uncorrected when it appears."); *Miller v. Pate*, 386 U.S. 1, 7 (1967) (United States Supreme Court "reaffirmed that it would countenance 'no deviation from th[e] established principle' developed" in *Mooney* and *Pyle*)).

---

[4] In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process."  373 U.S. 83, 87 (1963).  This duty to disclose applies "irrespective of the good faith or bad faith of the prosecution."  *Id.*

The Court must again deny qualified immunity at this stage of the proceedings. According to the Complaint, Defendants knew that the forensic report regarding the showerhead fingerprint was false. Defendants knew that the reports regarding the blood splatter and presumptive bloodstains on Plaintiff's shoes were false, along with the mid-trial testing showing that the tennis shoes actually corroborated Plaintiff's statement to police. The averments of the Complaint also state that the moving Defendants knew that their report containing Plaintiff's statement as to when he left Christine Siehl on the night of the murder was false. Although Plaintiff invokes *Brady* in Count III, he also invokes his due process protections under the Fourteenth Amendment which is sufficient to state a claim pursuant to *Mooney* and its progeny. Therefore, Plaintiff's allegations, if true, would constitute a violation of clearly established law that would have been apparent to a reasonable officer in 1991.

        3.      <u>Right to Counsel and Fair Trial</u>

Defendants argue that Plaintiff's claim for violation of his rights to counsel and to a fair trial must be dismissed because Plaintiff has averred no facts indicating their involvement in the facts giving rise to these claims. That is, they were not present when a codefendant allegedly observed the defense expert's forensic examination.

In response, Plaintiff references those allegations of the Complaint focusing on the pattern of continuing and concerted activity of Defendants Cancelliere, Wagner, Brant and Ermlick to create false evidence in order to charge Plaintiff with the murder of Christine Siehl. (Complaint ¶¶ 28-33, 35-36, 38-39, 41, 49, 60, 88, 90, 97-100.) On a motion to dismiss, the Court must take all of these allegations as true and construe all inferences in favor of the Plaintiff.

Moreover, Plaintiff directs the Court to Third Circuit caselaw holding that the government may not interfere with confidential communications between members of the defense team, citing *United States v. Rispo*, 460 F.2d 965, 976-78 (1972) and *United States v. Levy,* 577 F.2d 200, 207-210 (3d Cir. 1978). In *Rispo,* the Third Circuit held that intrusion by the government into the attorney-client relationship violated due process where a paid government informant participated in a joint trial as a "sham" defendant, and the informer's court-appointed counsel (who was not aware of the deception) conferred with the co-defendants' counsel concerning trial strategy. *Id.* at 977-78. In *Levy*, the United States Court of Appeals held that the criminal defendant's Sixth Amendment right to counsel was violated when a government informant codefendant disclosed defense strategy to the government. *See also United States v. Crow Dog*, 532 F.2d 1182, 1197-98 (8th Cir. 1976) (quoting and adopting *United States v. Cooper*, 397 F. Supp. 227 (D. Neb. 1975) (violation of Sixth Amendment right to counsel where government informant gains information relating to charge against criminal defendant by intruding into attorney-client relationship)).

Therefore, the Court must deny qualified immunity at this stage of the proceedings on Plaintiff's claim that these Defendants "acted jointly to interfere with the confidential and privileged attorney-client relationship attaching to the work of a defense expert retained for consultation and testimony at trial." (Complaint Count IV, ¶ 148.) In light of this Third Circuit precedent, these allegations, if true, would constitute a violation of clearly established law that would have been apparent to a reasonable officer in 1991.

### B.    MOTION TO DISMISS FILED BY DEFENDANT CITY OF JOHNSTOWN

Plaintiff's only claim against Defendant City of Johnstown is a *Monell* claim in Count VI for failure to train, supervise, and discipline. In support of its Motion to Dismiss, Defendant

Johnstown argues that Plaintiff cannot aver a policy or custom in the training, supervision, and discipline of its police officers that resulted in a pattern of other similar incidents prior to Plaintiff's arrest. Plaintiff responds that a failure to train claim can succeed without showing a prior pattern of unconstitutional conduct.

In *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983. In so ruling, however, the Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, that is, through application of the doctrine of respondeat superior. Instead, the Court concluded that a governmental unit may be liable under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. *Id.*

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation. *Id.* at 690-91. A municipal policy is made when a decision-maker issues an official proclamation or decision. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), *quoted in*, *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). A custom or practice, however, may consist of a course of conduct so permanent and widespread that it has the force of law. *Andrews*, 895 F.2d at 1480. To establish municipal liability based upon a custom or practice, the plaintiff must demonstrate that the decision-maker had notice that a constitutional violation could occur and that the decision-maker acted with deliberate indifference to this risk. *Berg v. County of*

*Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Finally, a plaintiff must show a causal connection between the custom or policy and the violation of the constitutional right. *Bielevicz v. Dubinon*, 915 F.2d 845, 850-51 (3d Cir. 1990). That is, a plaintiff must demonstrate an "affirmative link" or "plausible nexus" between the custom or practice and the alleged constitutional deprivation. *Bielevicz*, 915 F.2d at 850-51.

Where a pattern of constitutionally cognizable injury is not alleged, a Plaintiff may still make out a claim of § 1983 liability. In *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, the United States Supreme Court noted the following:

> In leaving open in [*City of*] *Canton* the possibility that a plaintiff might succeed in carrying a failure -to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice.

*Bryan County*, 520 U.S. 397, 409 (1997). For example, in *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989), the Court noted that failing to train armed officers "in the constitutional limitations on the use" of firearms would constitute deliberate indifference to an obvious risk.

Here, Plaintiff has alleged with great specificity that Defendant Johnstown caused the deprivation of his rights by its failure to employ policies and protocols regarding the training, supervision, and discipline of its police officers including, but not limited to, the initiation of prosecution only on a finding of probable cause, and police responsibility not to fabricate evidence or interfere with a criminal suspect's attorney -client relationship. (Complaint, ¶ 151.) Constitutional injuries are a "highly predictable consequence" of a failure to train (and likewise

supervise and discipline) police officers in the handling of recurring situations involving investigations and arrest. *See Bryan County*, 520 U.S. at 409. Plaintiff has alleged a plausible claim pursuant to *Monell* and *Bryan County*. Therefore, the Court must deny Defendant City of Johnstown's Motion to Dismiss Count VI.

### C.     **State Law Claim against Cancelliere and Wagner—Malicious Prosecution**

Finally, Defendants argue that Plaintiff's state law claim for malicious prosecution must be dismissed because Plaintiff has failed to aver that the proceedings against him were instituted without probable case and with malice, and because they are entitled to immunity under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S.A. § 8541 *et seq*.

In light of the Court's discussion regarding the § 1983 claims for malicious prosecution and fabrication of evidence, *supra* Part A.1., Plaintiff has plausibly alleged the absence of probable cause and malice. In addition, because Plaintiff has averred intentional conduct on the part of the moving Defendants, immunity is inapplicable. *See* 42 Pa. C.S.A. §§ 8545 & 8550. Therefore, Defendants' Motion to Dismiss the state law claim for malicious prosecution will be denied.

## IV.     CONCLUSION

For the reasons discussed above, the Motion to Dismiss filed by Defendants Cancelliere, Wagner and the City of Johnstown (ECF No. 34) will be denied. Those portions of the Motion to Dismiss asserting qualified immunity will be denied without prejudice to raising the issue after the close of discovery on summary judgment.

An appropriate Order will follow.

Dated: February 20, 2019

**BY THE COURT**


<u>s/Lisa Pupo Lenihan</u>
LISA PUPO LENIHAN
United States Magistrate Judge